# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC. #:
DATE FILED: 12/27/18

---

No. 17 Civ. 1646 (RJS)

---

NICOLAS EPSKAMP,

Petitioner,

VERSUS

UNITED STATES OF AMERICA,

Respondent.

---

No. 12 Cr. 120-2 (RJS)

---

UNITED STATES OF AMERICA,

VERSUS

NICOLAS EPSKAMP,

Defendant.

---

OPINION AND ORDER
December 27, 2018

---

RICHARD J. SULLIVAN, Circuit Judge:

Nicolas Epskamp petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, seeking to vacate, set aside, or correct the 264-month sentence imposed on him on June 23, 2015. (Doc. No. 269 (the "Petition").).[1]  For the reasons that follow, that petition is denied.

---

[1] Unless otherwise indicated, citations to the docket refer to those materials that appear in Petitioner's

## I. Background[2]

On December 15, 2011, law enforcement officers from the Dominican Republic and the United States Drug Enforcement Administration arrested Epskamp while he was aboard a private jet containing over a ton of cocaine. (*See, e.g.*, Doc. No. 175.) On July 2, 2012, a grand jury returned an indictment charging Epskamp and two co-defendants with one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine on board an aircraft registered in the United States in violation of 21 U.S.C. §§ 812, 959(b), and 960(a)(3). (Doc. No. 4.)[3] Following Epskamp's extradition from the Dominican Republic, the Court appointed attorneys Ira London and Avrom Robin as Epskamp's counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. (Doc. Nos.

---

criminal case, *United States v. Nicolas Epskamp*, 12-cr-120.

[2] The following facts are drawn from the trial transcript (Doc. Nos. 186, 188, 190, 192, 194, 196, 198 (collectively, "Tr.")) and exhibits introduced at trial. In ruling on the Petition, the Court has also considered Petitioner's declaration in support of the Petition (Doc. No. 270), the government's answer (17-cv-1646, Doc. No. 8), and Petitioner's reply (17-cv-1646, Doc. No. 11). Although the Court construes Petitioner's *pro se* submissions liberally, *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam), the Court draws all factual inferences in favor of the government in light of the jury's guilty verdict, *see Quartararo v. Hanslmaier*, 186 F.3d 91, 96 (2d Cir. 1999).

[3] In a superseding indictment filed January 29, 2015 (Doc. No. 175), Epskamp was indicted on the aforementioned conspiracy count as well as one count of possessing with intent to distribute five kilograms or more of cocaine on board an aircraft registered in the United States in violation of 21 U.S.C. § 960(b)(1)(B).

29, 43.) London and Robin represented Epskamp through both his trial and subsequent appeal.

On March 1, 2013, Epskamp's co-defendant, Rawson Watson, filed a motion to dismiss the indictment, which Epskamp joined (*see* Doc. No. 58), arguing that 21 U.S.C. § 959(b) does not apply to extraterritorial acts of drug possession. The Court denied this motion, reasoning that Section 959's plain language and internal structure compelled the conclusion that it prohibited extraterritorial possession with intent to distribute. (Doc. No. 72.) Epskamp subsequently filed a motion to suppress his own post-arrest statements on the grounds that he was not given *Miranda* warnings before being questioned by the DEA (Doc. No. 63), which the Court denied on June 20, 2018 (Doc. No. 78). In the same order, the Court scheduled trial to begin on September 9, 2013. (Doc. No. 78.) However, after the adjournment of an evidentiary hearing concerning Watson's motion to suppress post-arrest statements and the granting of co-defendant Nayef Fawaz's attorney's motion to withdraw (Doc. No. 84), trial was adjourned to October 21, 2013 (Doc. No. 85).

On September 6, 2013, Epskamp's counsel filed a motion under Rule 15 of the Federal Rules of Criminal Procedure to depose Cornelius Hendrik de Jongh, whom counsel believed could be "a potential witness for Mr. Epskamp." (Doc. No. 101.) According to the motion, de Jongh, who was "unavailable to testify at the upcoming trial" because he was incarcerated in a German prison (*id*. at 3), "would testify about

conversations with Mr. Epskamp about what was in the plane and the nature of the transaction concerning those contents, as well as Mr. Epskamp's responsibility regarding the shipment." (*Id*. at 2.) Counsel further advised the Court that de Jongh was "expect[ed] . . . to testify to conversations he had with Mr. Epskamp in which he invited Mr. Epskamp to fly on the plane for a legal purpose." (*Id*. at 3.)

On October 3, 2013, the Court granted counsel's request to depose de Jongh (Doc. No. 111), and at a conference on October 7, 2013, adjourned all pre-trial and trial deadlines without a date pending completion of the deposition. (*See* Doc. No. 112.) Accordingly, following Epskamp's request for an extension, which the Court granted (Doc. No. 125), Epskamp submitted a proposed letter rogatory on December 6, 2013 (Doc. No. 132), which the Court formally issued to German authorities on December 9, 2013 to request the deposition (Doc. No. 135). On July 29, 2014, Epskamp's counsel informed the Court via letter that de Jongh's deposition was expected to take place on November 19 and 20, 2014. (*See* Doc. No. 158.) Counsel noted, however, that German officials had "advised [the parties] . . . to prepare and be ready to submit to the German court [their] proposed questions for the deponent . . . ." (*Id.*) According to counsel's letter, it was necessary for both the government and Epskamp to submit their questions to the German court because "[a] key issue . . . under German procedure" is that a German judge – rather than the parties – questions a deponent. (*Id.* ("In Germany, only the Judge may question the deponent directly.").) In

light of this procedural difference, the government noted that it "reserve[d] the right to argue on the admissibility of and the weight given to the deposition testimony, depending on how events unfold." (*Id.*) The Court granted Epskamp's request for a continuance so that defense counsel could prepare for the deposition, authorized payment for both of his lawyers to travel to Germany for the deposition, directed Epskamp's counsel to submit a status letter to the Court by November 24, 2014, and excluded time under the Speedy Trial Act, 18 U.S.C. § 3161, through that date to allow for the deposition. (*Id.*)

On November 7, 2014, Epskamp's counsel – "with the approval of [their] client" – filed a letter with the Court withdrawing the deposition request regarding de Jongh and requesting that the Court set a new trial date. (Doc. No. 160.) The Court held a conference eleven days later, at which counsel relayed Epskamp's request for an immediate trial and his decision to withdraw his request to depose de Jongh. (*See* 17-cv-1646, Doc. No. 8-1.) In light of defense counsel's unavailability to try the case until February 2015, the Court informed Epskamp that if he wanted to have an earlier trial he could request the appointment of new counsel. (*Id.* at 4:2–11.) Epskamp declined that option, electing to remain with his counsel even if it meant a slightly later trial date. (*Id.* at 4:11–13.) Accordingly, after consulting with the parties, the Court set trial for February 23, 2015. (*Id.* at 4:16–24.) The Court also granted the government's request – without objection from Epskamp's counsel – to exclude time pursuant to the Speedy Trial

Act, and explained the following to Epskamp:

> So, Mr. Epskamp, we have talked about this before, but you have a right to a speedy trial, which generally would require the trial to be within 70 days of your indictment. We are obviously well past that, but that's because the law allows that time period to be extended for good reason . . . . Much of the time that we have stopped the clock was to allow you to have these depositions done in Germany of a witness that you believed was essential.

(*Id*. at 6:2–11.)

In response, Epskamp expressed his concern regarding the length of time he had waited to get a formal response from the German authorities. (*Id*. at 6:12–16.) The Court explained that letters rogatory and requests for assistance from foreign authorities involve "channels managed by the Executive Branch," and that this process had "been the reason for adjourning and extending the time for [Epskamp's] case." (*Id*. at 6:17–23.) The Court further explained to Epskamp that the trial could now proceed because Epskamp no longer wished to depose de Jongh. (*Id*. at 6:23–24.) Epskamp noted that he found the delay "very peculiar," but he did not express any second thoughts or desire to reconsider his decision to withdraw the deposition request. (*Id*. at 7:3–8.) There was no further discussion about de Jongh at the November 18, 2014 hearing. (*Id*. at 7:9–9:6.)

On December 24, 2014, Epskamp's counsel filed a letter renewing their request to offer de Jongh's testimony at trial. (*See* Doc. No. 169.) This time, however, counsel sought to have de Jongh testify live at trial via closed-circuit television ("CCTV") rather than by deposition. (*Id*.) Following a letter from the government opposing this request (Doc. No. 170 at 2–7), the Court issued an order on January 7, 2015 directing defense counsel to submit a reply to the government's opposition letter by January 16, 2015 explaining (1) the nature of de Jongh's testimony and its materiality, (2) whether de Jongh was in fact willing to testify, (3) the basis for cancelling the previous Rule 15 request to depose de Jongh, (4) whether the CCTV testimony would be compliant with the United States Constitution and United States law, and (5) the prospects for arranging the CCTV testimony in time for the trial scheduled to begin on February 23, 2015 (*id*. at 1).

Defense counsel filed a timely reply addressing all five of these issues on January 16, 2015. (Doc. No. 171.) According to counsel, de Jongh's testimony was material because it would "provide crucial support for the defense that [Epskamp] was invited to accompany the flight from the Dominican Republic for a legal purpose." (*Id*. at 2.) Counsel also indicated that de Jongh's attorney in Germany had "repeatedly confirmed . . . that de Jongh [was] willing to testify." (*Id*.) As for the basis for cancelling the prior deposition request, counsel stated that it was "because [they] had what [they] believed was an even more relevant witness regarding Epskamp's lack of knowledge that the plane's cargo was drugs." (*Id*.)

According to counsel, that witness, Rawson Watson, had initially been willing to testify at trial, but later "changed his mind and decided not to testify . . . ." (*Id.*) Counsel believed that Watson's "sudden about-face," which occurred after counsel withdrew the Rule 15 deposition request for de Jongh, "dictated [the] renewed request to [have de Jongh testify]." (*Id.*) And while counsel could not confirm whether the proposed CCTV testimony would conform with federal procedural and evidentiary rules because of difficulties reaching the German prosecutor responsible for the matter, counsel did note that – based on "the existence of a Mutual Legal Assistance Treaty between Germany and the United States" and "discussions with [de Jongh's attorney in Germany]" – he "believe[d] the proposed CCTV testimony [could] be set up and done within the existing trial schedule . . . ." (*Id.* (noting the process of securing the CCTV testimony would be "significantly less complicated than the Rule 15 deposition").) On January 21, 2015, the Court granted defense counsel's request to have de Jongh testify via CCTV at trial, "provided [his] testimony [would] not delay the trial and [would] be conducted in accordance with U.S. federal criminal procedure (*i.e.*, de Jongh will testify under oath and will be questioned directly by trial counsel via CCTV)." (Doc. No. 173.)

On the day trial was set to begin, February 23, 2015, counsel informed the Court that they were unable to arrange the CCTV testimony of de Jongh because "the German prosecutor . . . ha[d] been totally unresponsive."[4] (Tr. at 3:3–8.) According to counsel, they had "phoned him" and "e-mailed him as recently as the weekend [before trial]," but he did not respond. (*Id.*) Counsel stated that "[they] had done everything [they] could do" to secure the CCTV testimony, even adding that the government had also attempted to contact the German prosecutor by telephone and e-mail to no avail. (Tr. 3:14–16; *see also* 4:5–8.) When the Court asked counsel what he proposed to do in light of the unresponsiveness of the German prosecutor, counsel suggested that the Court itself make an attempt to reach the German prosecutor. (*Id.* at 3:16–17.) The Court demurred, noting that such requests for foreign assistance need to be "done through the proper channels." (*Id.* at 3:18–6:6.) Significantly, counsel did not request an adjournment of the trial to pursue the testimony further.

During trial, at which de Jongh did not testify, the government called a Dominican Republic police officer and introduced a copy of Epskamp's flight itinerary to establish that Epskamp traveled from the Netherlands to the Dominican Republic on or about December 4, 2011. (Tr. at 159:12–164:12.) The government also called Pako Podunajec, a cooperating witness and fellow member of the conspiracy with Epskamp in the Dominican Republic, who testified to Epskamp's knowledge that the planned flight from the Dominican would transport a "thousand [kilograms] of cocaine." (*Id.* at

---

[4] Counsel also placed an objection on the record "to the lack of response from the German government [regarding their] request to CCTV . . . de Jongh's testimony." (Tr. at 3:6–8.)

265:13–266:55.) According to Podunajec, he told Epskamp that the flight would travel from the Dominican Republic to Belgium with a thousand kilograms of cocaine on board, and Epskamp responded by saying, "Listen, I don't need to know . . . how much I am going [with] as long as I know when I am going. That is good enough for me." (Id. at 266:8–10.) Epskamp and Podunajec met several times in the run-up to the flight's departure. (Id. at 223.) During one of those meetings, Epskamp told Podunajec that he expected to receive credit for an outstanding drug debt and a payment of 50,000 euros in return for traveling on the flight with the drugs. (Id. at 224:2–25; 26:21–267:6.)

In addition to these witnesses, the government called Special Agent Joseph Thompson of the Drug Enforcement Administration, who testified that after the Dominican police arrested Epskamp on board the aircraft as it awaited takeoff from the Dominican Republic on the morning of December 15, 2011, he entered the plane and observed approximately 20 suitcases filled with cocaine (totaling approximately one thousand kilograms) and located several of Epskamp's personal belongings on the aircraft, including his suit jacket and computer bag. (Id. at 76:16–80:4; 87:19–21.) To further corroborate Epskamp's participation in the conspiracy, the government introduced text messages and recordings of phone conversations between Epskamp and his co-conspirators pursuant to a Dominican Republic wiretap that revealed Epskamp's involvement in coordinating the drug shipment. (See, e.g., Tr. at 309:22–312:20; 599:6–602:24.) On March 3, 2015,

the jury convicted Epskamp on both counts. (Id. at 806:14–808:20.) Following his conviction, Epskamp's counsel filed a motion for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, which the Court denied. (Doc. Nos. 201, 202.)

Epskamp appeared for sentencing on June 23, 2015. At the sentencing hearing, Epskamp's trial counsel argued that he was eligible for a minor role adjustment under section 3B1.2(b) of the United States Sentencing Guidelines ("U.S.S.G.") on the grounds that he was a "fungible" actor within the conspiracy. (Doc. No. 224 ("Sent. Tr.") at 16:25–19:18.) The Court rejected that assertion, noting "Epskamp [was no] more fungible than the pilots or . . . many of the other links [in the conspiracy]." (Id. at 20:16–18.) While the Court noted that Epskamp "certainly wasn't the architect of the conspiracy" or its "leader," the Court concluded that he was not a minor participant given that he was "hand-picked to play his role," spent over a week in the Dominican Republic "helping to coordinate the [transportation of the drugs]," and stood to gain a substantial sum of money for his participation. (Id. at 24:15–25:7.) In light of those factors, the Court found that the minor role adjustment was inapplicable to Epskamp. (Id. at 25:6-7.) After determining that the applicable range under the United States Sentencing Guidelines was between 235 to 293 months' imprisonment based on Epskamp's offense level of 38 and criminal history category of I, the Court sentenced Epskamp to 264 months in prison. (Id. at 26:2–8; 44:20–21.) The Court explained its reasons for the 264-month sentence by

noting that Epskamp's involvement in the conspiracy to transport a "metric ton of cocaine" was a "serious" crime, that he played an "important" role in the conspiracy, and that he had three prior convictions in Europe involving large quantities of drugs, including one for more than a ton of cocaine. (*Id*. at 40:2-44:3.)

After sentencing, Epskamp appealed both his conviction and his sentence to the Second Circuit, arguing that: (1) the Court lacked jurisdiction over Epskamp's alleged conduct under 21 U.S.C. § 959(b), (2) the evidence at trial was insufficient to convict him, (3) the Court erred by instructing the jury that it could find Epskamp guilty without determining whether he knew the aircraft was registered in the United States, (4) the Court abused its discretion by denying Epskamp a minor role reduction under U.S.S.G. § 3B1.2(b), and (5) Epskamp's Fifth and Sixth Amendment rights were violated as a result of the government's failure to help arrange de Jongh's testimony. *See* Brief of Petitioner, *United States v. Epskamp*, 832 F.3d 154 (2d Cir. 2016) (No. 15-2028), 2015 WL 7308829. On August 5, 2016, the Second Circuit, by way of both a written opinion and a summary order, rejected all of Epskamp's claims and affirmed both his conviction and sentence. *United States v. Epskamp* ("*Epskamp*"), 832 F.3d 154 (2d Cir. 2016); *United States v. Epskamp* ("*Epskamp II*"), 2016 WL 4191126 (2d Cir. Aug, 5, 2016) (summary order). In the written opinion, the Second Circuit addressed only Epskamp's argument concerning the applicability of 21 U.S.C. § 959(b). *Epskamp*, 832 F.3d at 158. The Second Circuit concluded that his remaining claims – including that he should have received a minor role reduction at sentencing – "[did] not warrant significant explication," and therefore resolved them by summary order. *Id*. In upholding the Court's denial of a minor role reduction via the summary order, the Second Circuit noted that "[t]he mere fact that Epskamp played a discrete role as courier does not mean that his role was necessarily minor." *Epskamp II*, 2016 WL 4191126 at *2.

On March 3, 2017, Epskamp, proceeding *pro se*, filed this Petition, alleging ineffective assistance of counsel at both trial and on appeal. (Doc. No. 269.) Attached to Epskamp's petition is an affidavit that he claims is from de Jongh. (*Id*. at Ex. A.) The affidavit, which was provided in both Dutch and English, purports to summarize what de Jongh would have testified to had he been called as a witness during Epskamp's trial, including that (1) de Jongh asked Epskamp for "a favor" sometime around November 2011 (*id*. at ¶ 2), (2) that the favor required Epskamp to go to the Dominican Republic and help transport "medical equipment" via airplane from the Dominican Republic to Africa (*id*. at ¶ 3), and (3) de Jongh never disclosed to Epskamp that the plane would be carrying cocaine (*id*. at ¶ 4). Epskamp asserts that there is a "reasonable probability" that the jury would have acquitted him had this testimony been offered at trial. (Doc. No. 269 at 9.)

The government submitted its brief in opposition to Epskamp's motion to vacate on July 3, 2017 (17-cv-1646, Doc. No. 8),

and Epskamp filed his reply on August 28, 2017 (17-cv-1646, Doc. No. 11).

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, "a federal prisoner may move the sentencing court to vacate, set aside, or correct the sentence on the ground that such sentence was illegally imposed." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). Relief is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal citations and quotation marks omitted). If proven, a claim of ineffective assistance of counsel is a constitutional error that warrants relief under Section 2255. *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000) (citing *United States v. Gordon*, 156 F.3d 376, 381 (2d Cir. 1998)).

The Sixth Amendment right to counsel requires that a criminal defendant be provided "the effective assistance of counsel." *United States v. Daugerdas*, 915 F. Supp. 2d 493, 495 (S.D.N.Y. 2013) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). This right to effective assistance applies equally to trial counsel and appellate counsel. *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985)). To prevail on an ineffective assistance of counsel claim, a petitioner must prove that (1) his counsel's performance was deficient, and (2) he was prejudiced by the deficient performance.

*Gueits v. Kirkpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). An attorney's performance is considered deficient under the Sixth Amendment only if it "fell below an objective standard of reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. However, in determining whether an attorney's performance was objectively unreasonable, a court must view the attorney's conduct in light of "the circumstances counsel faced at the time of the relevant conduct . . . ." *Parisi v. United States*, 529 F.3d 134, 141 (2d Cir. 2008) (internal quotation marks and citations omitted); *see also McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) ("[A] court may not use hindsight to second-guess counsel's tactical choices." (internal quotation marks and citations omitted)). But even if a petitioner is able to establish that his counsel's conduct was objectively unreasonable, he must still demonstrate prejudice, which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. While this prejudice prong "does not require a showing that counsel's actions more likely than not altered the outcome," it does require a petitioner to show that "[t]he likelihood of a different result [was] substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

## III. DISCUSSION

Epskamp raises two ineffective assistance of counsel claims. First, he argues that his attorneys provided

ineffective assistance on appeal because they failed to investigate the relevant law surrounding a mitigating role reduction under Section 3B1.2 of the United States Sentencing Guidelines. (Doc. No. 269 at 4.) Second, Epskamp argues that those same attorneys were ineffective at trial because they withdrew their request for de Jongh's deposition in Germany and later failed to secure de Jongh's testimony at trial via CCTV. (*Id.* at 6–7.) The Court will discuss each claim in turn.

## A. Ineffective Assistance of Counsel on Appeal

Epskamp contends that his attorneys were ineffective on appeal because they failed to investigate Amendment 794 to the commentary of section 3B1.2 of the Guidelines, which became effective after Epskamp's sentencing but before his appeal to the Second Circuit. (Doc. No. 269 at 5.) That amendment resolved a circuit split regarding how courts should apply the mitigating role reduction. Prior to Amendment 794, some courts – including those within the Second Circuit – compared a defendant's conduct to that of both his co-conspirators and the typical offender. *See, e.g.*, *United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002) ("[T]his Circuit has held that a minor-role adjustment is not available merely on a showing that the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be minor as compared to the average participant in such a crime." (internal quotation marks and citations omitted)). By contrast, other courts had adopted an approach whereby defendants

were compared to other participants in their own criminal activity but not to the typical offender. *See, e.g., United States v. Johnson*, 297 F.3d 845, 874 (9th Cir. 2002) ("Clarifying [section 3B1.2], we have held that a defendant's culpability is to be measured against his co-conspirators, not the hypothetical average participant." (internal quotation marks and citations omitted)). Amendment 794 resolved the split by adopting the approach of the Seventh and Ninth Circuits. U.S. Sentencing Guidelines Manual app. C, amend. 794 ("[W]hen determining mitigating role, the defendant is to be compared with the other participants 'in the criminal activity.'"). According to Epskamp, his attorneys' failure to reference Amendment 794 on appeal constituted ineffective assistance. (Doc. No. 269 at 5–6.)

Epskamp's claim that appellate counsel was ineffective for not citing Amendment 794 is meritless, however, because he cannot show a reasonable probability that the result of his appeal would have been different had they done so. *See, e.g., Strickland*, 466 U.S. at 694; *Hill v. United States*, No. 14-cr-206, 2017 WL 327474 (E.D.N.C. Jan 23, 2017) (finding counsel was not ineffective for failing to raise Amendment 794 at sentencing where doing so would not have benefited the defendant because defendant's role in the conspiracy was clearly not minor). The revised commentary to Section 3B1.2 makes clear that the mitigating role reduction is reserved solely for a defendant who "plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt., app. n.

3(A). Although Epskamp may not have been the leader of the conspiracy, it can hardly be argued that he was "substantially less culpable" than the other participants in the scheme to bring a thousand kilograms of cocaine to Belgium from the Dominican Republic. As the Court noted at sentencing, the conspiracy in which Epskamp participated was "horizontal" rather than "vertical." (Sent. Tr. at 20:13–14.) In other words, Epskamp was no more "fungible than the pilots or any more fungible than many of the other links" in the conspiracy. (*Id*. at 24:15–18.) He was "hand-picked" for his role, spent "over a week" in the Dominican Republic coordinating the scheme with Watson, understood his role in the conspiracy, and expected to receive 50,000 Euros and have an outstanding drug debt forgiven in exchange for his participation. (*Id*. at 24:15–25:7.) On these facts, the Court concluded Epskamp was "not just a fungible babysitter," but rather was someone with "a more important role." (*Id*. at 23:8–10.) Significantly, a unanimous panel of the Second Circuit affirmed that conclusion, observing that "[t]he mere fact that Epskamp played a discrete role as courier does not mean that his role was necessarily minor." *Epskamp*, 2016 WL 4191126, at *2. Thus, given that Epskamp's conduct – even when compared only to the other members of his conspiracy – cannot be deemed minor, he has failed to demonstrate that there is a substantial likelihood that he would have received the minor-role adjustment if his attorneys had attempted to rely on Amendment 794. Accordingly, Epskamp's assertion that he received

ineffective assistance during his appeal must be rejected.

### B. Ineffective Assistance of Counsel at Trial

Epskamp next argues that his attorneys provided ineffective assistance at trial because of their handling of de Jongh, whom Epskamp asserts would have provided exculpatory testimony. (Doc. No. 269 at 6–7.) According to Epskamp, the first error his attorneys made regarding de Jongh was withdrawing their request to depose him pursuant to Rule 15. (*Id*. at 8.) Their second putative error was their failure to secure de Jongh's testimony via CCTV during trial. (*Id*.) The Court will analyze each alleged error in turn.

#### 1. Cancellation of the Rule 15 Deposition

Epskamp asserts that his attorneys' decision to cancel de Jongh's deposition constituted ineffective assistance because de Jongh was "a potential material witness [who] was willing to provide crucial exculpatory testimony for the defense." (*Id*. at 7.) According to the purported affidavit from de Jongh, attached to Epskamp's petition, de Jongh would have testified to Epskamp's lack of knowledge that the plane he boarded in the Dominican Republic contained drugs (Doc. No. 269, Ex. A at ¶¶ 3, 4), thereby negating an essential element of the crime for which Epskamp was convicted (Doc. No. 269 at 7–8). Epskamp thus alleges that his attorneys were objectively unreasonable to cancel de Jongh's deposition. (*Id*.)

As an initial matter, the government questions the authenticity and reliability of de Jongh's affidavit. (17-cv-1646, Doc. No. 8 at 24.) Specifically, the government points out that the affidavit, which contains both Dutch and English versions of de Jongh's purported testimony, does not contain "a declaration from a certified interpreter" establishing the validity of the translation nor any indication as to "which [version] is the original . . . ." (*Id.*) Additionally, while the English version is dated, the Dutch version is not. (*Id.*) Finally, the government notes that although de Jongh declared in the affidavit that his statements were being made "under the laws of the United States . . . and under penalty of perjury," he later stated that he was unwilling to come to the United States, which is the jurisdiction where he would be subject to punishment for perjury. (*Id.* (quoting Doc. No. 269, Ex. A ¶ 16).) In light of these issues with the affidavit, the government asserts that the affidavit "is an unreliable indicator of the testimony that de Jongh purportedly would have provided[.]" (17-cv-1646, Doc. No. 8 at 24.)

Although the government's concerns about the reliability of the affidavit may well be valid, the Court will assume for the purposes of this motion that the affidavit is what it purports to be (i.e., an affidavit from de Jongh) and that it is a reliable indicator of what de Jongh would have testified to had he been deposed. *See Herzog v. United States*, 38 F. App'x 672, 674 (2d Cir. 2002) (concluding that petitioner's ineffective assistance claim failed "even if all of [his] factual allegations [were] accepted as true"). Clearly, if the affidavit were taken at face value and deemed to be reliable, there can be little doubt that de Jongh could have provided at least some exculpatory testimony. (*See* Doc. No. 269 at 7.)

Nevertheless, under *Strickland*, the first question that must be answered regarding the decision of Epskamp's attorneys to cancel de Jongh's deposition is whether that decision "fell below an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 688. On the facts before it here, the Court has little hesitation concluding that the cancellation of de Jongh's deposition was a "tactical decision" constituting "sound trial strategy." *Id.* at 689; *see also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (per curiam) ("[The] failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."). As Epskamp acknowledges, the decision to cancel de Jongh's deposition was made after counsel interviewed another expected defense witness, Rawson Watson, whom counsel apparently believed would be a much better witness than de Jongh. (Doc. No. 269 at 7.) Indeed, Epskamp indicates that, after counsel interviewed Watson, counsel told Epskamp that Watson was "the best witness we can have" (*id.*), since Watson – unlike de Jongh – had been with Epskamp in the Dominican Republic, where most of the critical events regarding the conspiracy occurred (Tr. at 246:18–267:20; 222:14–223:16; *see also* Doc. No. 269, Ex. A ¶ 4). Moreover, Watson would have been able to provide live, in-person testimony at trial, thereby avoiding the delay and evidentiary objections likely to accompany a

Rule 15 deposition taken in Germany by a German judge.

The objective reasonableness of counsel's belief that Watson was a better witness than de Jongh can hardly be disputed. Watson could testify in person about the most critical events in the case (*i.e.*, the events in the Dominican Republic); de Jongh could not. And while both would be subject to impeachment regarding their past criminal conduct, testimony regarding de Jongh's criminal history would likely have been more harmful to the defense, especially considering the strong possibility that it would have opened the door to the government questioning de Jongh about his past relationship with Epskamp, which, among other things, would have included the prior drug debt that Epskamp sought to have forgiven by participating in the conspiracy. (*See* Tr. at 224:13–225:14; *see also* 17-cv-1646, Doc. No. 8 at 22 n.10.) Indeed, Podunajec testified that Epskamp joined the operation in the Dominican Republic to pay off a debt to his friend "Jack" from Holland that resulted from a failed drug deal. (Tr. 224:13–225:14.) In his affidavit, de Jongh stated that he resided in Holland and admitted that he asked Epskamp to go to the Dominican Republic. (Doc. No. 269, Ex. A ¶¶ 3, 4.) As the government points out, "an obvious line of questioning" had de Jongh testified would have concerned the issue of whether de Jongh was in fact "Jack" from Holland to whom Epskamp owed a drug debt. (17-cv-1646, Doc. No. 8 at 22 n.10.) Epskamp's counsel could have thus reasonably believed that any benefit from de Jongh's anticipated testimony would have been outweighed by its potential not only to undercut the defense's theory that Epskamp had no idea that the operation in the Dominican Republic involved cocaine, but also by its potential to corroborate Podunajec and further to connect Epskamp to past drug dealing. *See United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986) (finding counsel not ineffective for refusing to call witness whose past "large-scale heroin dealings" and "relationship with [defendant]" would have harmed defendant's case). Therefore, at the time the decision to cancel de Jongh's deposition was made, it was objectively reasonable for counsel to believe that Epskamp would benefit from having Watson, rather than de Jongh, testify about Epskamp's alleged lack of knowledge that the flight from the Dominican contained cocaine. *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (noting that courts reviewing ineffective assistance claims "may not use hindsight to second-guess [an attorney's] strategy choices").

Moreover, the fact that Epskamp wished to expedite his trial instead of pursuing de Jongh's deposition also weighs heavily against his claim of ineffective assistance of counsel. In the November 7, 2014 letter withdrawing the deposition request (which counsel made clear was approved by Epskamp), counsel informed the Court that Epskamp was anxious for an immediate trial date. (Doc. No. 160.) At the hearing eleven days later, Epskamp – through counsel – told the Court that he preferred a trial date in February or earlier. (17-cv-1646, Doc. No. 8-1 at 3:18–20 ("My client would prefer February. He would prefer earlier, but my schedule precludes that.").) In fact,

Epskamp's desire for an earlier trial date prompted the Court to advise Epskamp that if he wished to have an earlier trial date than his current counsels' schedule would allow, he could "explore the opportunity of getting new counsel." (*Id.* at 4:2–7.) Epskamp then took a moment to confer with counsel regarding whether he should seek new counsel in order to get an earlier trial date, but he ultimately declined. (*Id.* at 4:10–13.) When the Court proceeded to set a trial date following Epskamp's request, the Court reminded Epskamp that the reason trial had previously been delayed was to allow him to pursue a deposition of de Jongh. (*Id.* at 6:22–24 ("[The letters rogatory and requests for assistance necessary to secure de Jongh's deposition has] been the reason for adjourning and extending the time for this case. You no longer want that so we are now going to have a trial.").) Epskamp – having made the decision to forego de Jongh's deposition to obtain an earlier trial date – cannot now fault his attorneys for complying with his wishes. Indeed, the Second Circuit has made clear that "[d]eferring to the wishes of a client does not constitute ineffective assistance of counsel." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 196 (2d Cir. 2008). Accordingly, Epskamp's counsels' decision to withdraw the deposition request in light of his request for an earlier trial was not objectively unreasonable.

Yet even if Epskamp could somehow demonstrate that his attorneys' decision to cancel de Jongh's deposition was objectively unreasonable, he would still not be entitled to relief because he has not satisfied *Strickland*'s prejudice prong, which requires him to show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In other words, Epskamp has failed to show that there is a reasonable probability that he would not have been convicted had de Jongh's potential deposition testimony been admitted at trial. First, it is not at all clear that de Jongh would have sat for such a deposition or that such testimony, even if given, would be admissible in a United States court. (*See* Doc. No. 158 (noting the government's position that it reserved the right to challenge the admissibility and weight of de Jongh's testimony given that "under German procedure, neither Mr. Epskamp nor the government can question the deponent directly, but rather, must submit questions either in advance or at the deposition to the German judge who will be in charge of the deposition.").).

More importantly, the weight of the evidence against Epskamp was nothing short of overwhelming, making it highly improbable that de Jongh's expected testimony would have provided the jury with reasonable doubt. As noted above, the government produced at trial, among other things, text messages and recorded telephone calls incriminating Epskamp, physical evidence (*e.g.*, Epskamp's suit jacket and wallet on the plane carrying a metric ton of cocaine), and the testimony of a cooperating witness and law enforcement officers. (*See, e.g.*, Tr. at 599:6–602:24.) While Epskamp argues that de Jongh's testimony would have demonstrated that he did not know the plane contained drugs

because de Jongh allegedly told Epskamp that the plane would be carrying medical supplies (Doc. No. 269, Ex. A ¶¶ 3–4), the jury heard testimony from Podunajec – a member of the conspiracy who, unlike de Jongh, was with Epskamp in the Dominican Republic (Tr. at 222:14–223:16) – indicating that he told Epskamp in the Dominican Republic that the plane would be carrying "a thousand kilo[grams of] cocaine" (Tr. at 224:5). Moreover, there is not one mention of medical supplies or shipments to Africa in any of the text messages or recorded phone calls introduced at trial. Hence, the jury would likely have viewed de Jongh's deposition testimony with great skepticism. *See, e.g., Moskowitz v. United States*, No. 01-cv-10644 (MBM), 2002 WL 31119269, at *4 (S.D.N.Y. Sept. 24, 2002) (rejecting ineffective-assistance claim based on counsel's failure to call a witness because the jury would have been unlikely to credit the testimony); *Krasniqi v. United States*, 195 F. Supp. 3d 621, 634 (S.D.N.Y. 2016) (same).

Finally, even if de Jongh's testimony regarding Epskamp's knowledge were credited by the jury, it would only have demonstrated that Epskamp might have *initially* been unaware that the plane would be carrying drugs, not that he lacked the requisite knowledge by the time of his arrest. Put simply, de Jongh's testimony – even if believed – would not have rebutted the testimony of Podunajec or the other evidence introduced at trial relating to Epskamp's conduct and knowledge after he arrived in the Dominican Republic. Accordingly, the Court has little difficulty concluding that Epskamp did not receive

ineffective assistance of counsel when his attorneys cancelled de Jongh's deposition.

### 2. Counsel's Failure to Secure de Jongh's Testimony via CCTV at Trial

Epskamp's next contention is that his attorneys were ineffective for failing to secure de Jongh's testimony via CCTV from a German prison after learning Watson no longer wished to testify. (Doc. No. 269 at 8.) To be clear, Epskamp is not arguing that his attorneys made no attempt to secure the testimony via CCTV. Indeed, Epskamp concedes that they requested and received the Court's permission to have de Jongh testify via CCTV. (*Id.*) Nor does Epskamp dispute that his attorneys also attempted to contact the German prosecutor in charge of handling such requests, although they were ultimately unsuccessful due to the unresponsiveness of the German authorities. (Tr. at 3:3–8.) And the record is clear that on the day trial was set to commence, Epskamp's counsel objected "to the lack of response from the German government" and even took the unconventional step of asking the Court to contact the German authorities. (*Id.* at 3:6–17.) Thus, by all appearances, Epskamp's attorneys did everything they could reasonably do to procure de Jongh's testimony.

Despite his attorneys' diligent efforts to arrange the testimony via CCTV, Epskamp contends they nevertheless provided ineffective assistance by failing to ultimately secure that testimony. But the Sixth Amendment demands that counsel be competent, not omnipotent. Under *Strickland*, attorneys who fail to secure a witness's testimony despite their diligent

efforts are not deemed ineffective. *See, e.g.*, *McTier v. New York*, No. 07-cv-870, 2009 WL 792087, at *6 (E.D.N.Y. Mar. 23, 2009) (rejecting argument that counsel was ineffective for failing to secure missing witness's testimony where counsel made sufficient attempts to do so). The record in this case makes clear that although Epskamp's attorneys were ultimately unable to secure de Jongh's testimony, it was not for lack of trying. (*See* Tr. at 3:3–17.) They made a successful motion to seek de Jongh's testimony and made multiple attempts to contact the relevant German authorities. (*Id.* at 3:3–17 ("Mr. Luebke, the German prosecutor, has been totally unresponsive. We phoned him. We have e-mailed him as recently as the weekend, and he has not responded in any way . . . . We have done everything we can do . . . .").) Epskamp's attorneys cannot be faulted for the unresponsiveness of the German authorities, which was something completely beyond their control. *Cf. Rodriguez v. Portuondo*, No. 01-cv-547, 2006 WL 2168314, at *8 (S.D.N.Y. Aug. 1, 2006) (finding counsel's failure to locate witness not objectively unreasonable where nobody could provide witness's last name or address).

And while Epskamp appears to suggest that his attorneys should have requested a continuance to secure de Jongh's testimony (Doc. No. 269 at 8), it was not objectively unreasonable for them to decline to do so. After all, because the Court had conditioned the renewed Rule 15 request on the testimony not delaying trial, counsel could reasonably have believed a request for a continuance would have been fruitless. *See, e.g.*, *Narvaez v. United States*, No. 02-cv-

2308, 2003 WL 21749638, at *6 (S.D.N.Y. July 29, 2003) (finding counsel not ineffective where revival of motion for continuance would have been fruitless given that the court had previously rejected defendant's prior motions for a continuance that were based on the same rationale). Moreover, the record makes clear that Epskamp himself had grown tired of waiting and was demanding a trial forthwith. (*See* 17-cv-1646, Doc. No. 8-1 at 3:18–20.)

Yet even if Epskamp's attorneys' failure to request a continuance could be considered objectively unreasonable, the fact remains that Epskamp has again failed to meet the second prong of the *Strickland* test – prejudice. In fact, while the prejudice analysis regarding the decision to withdraw the deposition request for de Jongh is equally applicable here, there are two additional reasons why his attorneys' failure to request a continuance to secure de Jongh's testimony would not have changed the outcome of his trial.

First, there is no reason to believe that such a continuance request, if made, would have been granted. After all, a district court "enjoy[s] broad discretion in granting or denying trial continuances," *United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013), and the Court in Epskamp's case had already made clear that the request to have de Jongh testify via CCTV was conditioned, in part, on the testimony not delaying trial. (Doc. No. 173.) Epskamp's counsel cannot be deemed ineffective for declining to make what almost certainly would have been a fruitless motion for a continuance. *See Narvaez*, 2003 WL 21749638, at *6.

Second, even assuming, arguendo, that a continuance would have been granted, it is unclear, and in fact doubtful, that de Jongh would have been permitted by German authorities to testify via CCTV in a manner consistent with United States federal criminal procedure, which was the second condition the Court placed on counsel seeking de Jongh's CCTV testimony. (Doc. No. 173.) The record is clear that the German authorities were unwilling to accommodate United States procedures during the previously scheduled deposition request of de Jongh (*see* Doc. No. 158), and there is no indication that they would have been more willing to comply with United States criminal procedure had they permitted de Jongh to testify via CCTV. Indeed, Epskamp has offered no evidence to suggest that German authorities would have permitted de Jongh to testify via CCTV at all. Accordingly, Epskamp has not shown that he was prejudiced by his counsels' decision to not seek a continuance in order to secure de Jongh's testimony.

## IV. CONCLUSION

In sum, the evidence at trial and sentencing established that Epskamp, a longtime drug trafficker, played a substantial role in a scheme to transport a massive amount of cocaine from the Dominican Republic to Europe on a plane registered in the United States. That Epskamp was convicted at trial, and that his conviction and sentence were affirmed on appeal, was clearly a function of that evidence, not the inadequacy of his attorneys, who represented him vigorously and ably throughout his trial, sentencing, and appeal.

Thus, and for the reasons set forth above, Epskamp's Petition is DENIED.

Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253. The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 269 in Case No. 12-cr-120, to close Case No. 17-cv-1646, and to mail a copy of this order to Petitioner.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: December 27, 2018
New York, New York